UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

JASON W. NELSON and DEBRA NELSON,)
)
*Plaintiffs*,                          )
)            Case No. 1:12-cv-204
v.                                     )
)            Judge Mattice
INMAN HOMES, INC., *et al.*,           )
)
)
*Defendants*.                          )
)

## ORDER

Before the Court is an opposed Motion for Summary Judgment filed by Defendants Inman Homes, Inc. (hereinafter, "Inman") (Doc. 38) and an unopposed Motion for Summary Judgment filed by Defendant Louisville Ladder, Inc. (hereinafter, "Louisville") (Doc. 40).[1] Also before the Court are numerous motions in limine filed by the parties. (Docs. 60-67). For the reasons stated herein, the Court will **GRANT IN PART** and **DENY IN PART** Inman's Motion for Summary Judgment (Doc. 38), and will **GRANT** Louisville's Motion for Summary Judgment (Doc. 40). The Court will **RESERVE RULING** on the parties' motions in limine. (Docs. 60-67).

---

[1] Defendants Danny Dunaway, Sewell Dunaway, and Sam Crye have not filed dispositive motions.

## I.    BACKGROUND [2]

For the purposes of summary judgment, the Court will view the facts in the light most favorable to Plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Thomas Hughes decided to build a residential single family home for himself and his wife; after firing his general contractor, he hired Jason Nelson to help him in continuing to build the house at an hourly rate.  Nelson testified that he considered himself an employee of Hughes, rather than a contractor.  (Doc. 39-1 at 4).  (Doc. 52-1 at 3-8).  Hughes soon realized that he and Nelson could not do all of the work themselves, so he contacted Inman Homes in an effort to hire additional help with finishing the project.  (*Id.* at 7-10; Doc. 52-2 at 10).  Inman Homes is operated by Jonathan "Johnny" Inman, a licensed general contractor.  (Doc. 52-2 at 2, 20-21).  According to Inman, he is the president and sole shareholder of Inman Homes, and the company hasn ever had any employees.[3]  (Doc. 39-3 at 2-4).

On March 6, 2011, Johnny Inman and Hughes signed a contract whereby Hughes agreed to pay Inman Homes $4,486.00 in exchange for "framing labor for one week," with a weekly renewal of the contract available upon the agreement of the parties.  (Doc.

---

[2] At the outset, the Court notes that the briefs contain numerous factual statements that either contain no citation to evidence in the summary judgment record or contain citations to portions of deposition testimony that were not submitted into evidence.  The Court notes that, in reviewing both parties' briefs, it will consider only those factual assertions that are properly supported by citations to evidence of record.  *See* Fed. R. Civ. P. 56(c)(1); Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials."); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) (noting that a district court is neither required to speculate on which portion of the record a party relies, nor is it obligated to "wade through" the record for specific facts); *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("A district court is not required to 'search the entire record to establish that it is bereft of a genuine issue of material fact.' *Street* [*v. J.C. Bradford & Co.*], 886 F.2d 1472, 1479–80 [(6th Cir. 1989)]. Judges are not like pigs, hunting for truffles that might be buried in the record.") (quotation and alteration omitted).

[3] For the purposes of the remainder of this Order, Inman Homes, LLC will be referred to as "Defendant Inman" or simply "Inman"; Johnny Inman will be referred to by name.

52-4).  The contract specified that the labor price was "based on five workers eight hours per day for a five day work week" and that Inman was to provide workers' compensation and general liability insurance for its crew of workers.  (*Id.*; Doc. 52-1 at 14).

Although not detailed in the written contract, Johnny Inman testified that he did not have a duty or responsibility to supervise the workers that he supplied.  (Doc. 39-3 at 6).  Hughes, however, expected that the workers provided by Inman would be working for Johnny Inman – that is, Hughes expected that Johnny Inman would supervise the crew regarding their work as well as job site safety.  (Doc. 52-1 at 15-17).  Hughes placed a few detailed restrictions upon the manner in which the workers were to perform the construction – specifically, he did not want any nail guns used in the framing work and did not want the Tyvek siding to be installed until after the walls were finished.  (*Id.* at 18; Doc. 52-5 at 2).

Johnny Inman, Hughes, and Nelson understood that Nelson would continue to be involved in the project to protect Hughes' interests and make sure the work was high quality and done as Hughes wanted; however, Hughes did not consider Nelson to be the general foreman at the construction site and did not expect Nelson to supervise how the work was performed.  (Doc. 52-1 at 11-13, 18; Doc. 52-2 at 12; Doc. 52-3 at 2).  Hughes ceased his involvement with the construction once the crew of workers arrived at the job site.  (Doc. 52-1 at 13).

Inman sent five workers to Hughes' job site: Samuel Crye, Elbert "Sewell" Dunaway, Danny Dunaway, DJ Dunaway, and Eddie Dunaway.  (Doc. 39-4 at 5).  Inman does not execute written contracts with his workers, and instead relies solely on verbal work agreements.  (Doc. 39-3 at 6; Doc. 52-2 at 10; Doc. 52-6 at 9).  Johnny Inman believed that his workers were subcontractors just like himself; Crye, Danny Dunaway,

and Elbert Dunaway also expressed a belief that they were acting as subcontractors. (Doc. 39-4 at 2-3; Doc. 39-5 at 10-11; Doc. 39-6 at 3; Doc. 52-2 at 14).  Nonetheless, according to Elbert and Danny Dunaway, Johnny Inman "was the boss," and the workers would have followed his instructions regarding the manner in which the work was performed if he had so directed them; Nelson also believed that Johnny Inman was supervising the workers.  (Doc. 52-3 at 13; Doc. 52-5 at 13; Doc. 52-9 at 2).  On occasion, Nelson observed that Johnny Inman had given the workers instructions regarding the general scope of work of the project as a whole, but not as to the specific details of the project.  (Doc. 52-3 at 14).

However, Elbert Dunaway also indicated that Jason Nelson was "more or less" the crew's boss.  (Doc. 52-9 at 3).  Although he was not involved in the work after the crew's arrival, Hughes stated a belief that Nelson acted as a job supervisor and functioned in the role of directing the crew's daily work in framing the house.[4]  (Doc. 39-2 at 5-6).  Johnny Inman conceded that the home owner or general contractor would come to him if there was a problem with the work being done on site and that he would hire someone else if the workers did not show up.  (Doc. 52-2 at 9-10).

Crye originally supervised the crew of workers at the job site on behalf of Defendant Inman.  (Doc. 52-2 at 8; Doc. 52-6 at 4).  After a week or two, Crye left; however, the Dunaways remained on the job, with Danny acting in the supervisory role. (Doc. 52-2 at 8; Doc. 52-6 at 4).  Johnny Inman was not present at the site on a daily basis, and instead personally went to the job site one to three times a week to make sure the work was being done.  (Doc. 52-2 at 16; Doc. 52-3 at 12-13).  Danny Dunaway and/or

---

[4] Hughes did not expressly hire Nelson as a "job supervisor" or give Nelson explicit instructions regarding his authority over Inman's crew.  (Doc. 39-2 at 5-6).  Instead, Hughes indicated that he trusted Nelson's carpentry and construction expertise and felt that he needed Nelson's input on what to do and what not to do with the project in order to save himself "damage and money."  (*Id.* at 5-7).

Nelson would give the workers directions regarding their daily work. (Doc. 39-1 at 17). According to Crye, the crew would sit down together in the mornings to discuss how to best accomplish the day's work; no one person was "domineering [to] the rest[.]" (Doc. 39-4 at 9).

The duties of the supervisory crew worker – that is, Crye and then Danny Dunaway – included keeping track of the other workers' hours and submitting the hours to Johnny Inman. (Doc. 52-6 at 5-6). Inman would then write the workers a check for the hours worked every Friday afternoon. (*Id.* at 6). Hughes did not keep track of the hours of the workers that Inman provided, nor did he set the rate of pay for these individuals or have knowledge of Inman's pay arrangements for the workers.[5] (Doc. 52-1 at 20-21).

Hughes expected Inman and its workers to provide any necessary construction and safety equipment. (Doc. 52-1 at 18-19). Crye indicated that Inman supplied all of the materials needed for Hughes' job, and stated that if additional purchase or rental of equipment or supplies had been necessary, Crye would have gotten it on his own and billed Inman for it. (Doc. 52-6 at 7-9). Johnny Inman, however, testified that the workers provided their own equipment. (Doc. 39-3 at 5). It is undisputed that Inman's crew provided its own tools. (*Id.*; Doc. 39-4 at 6).

The Dunaways erected scaffolding at the job site that consisted of two ladders, approximately 8 to 10 feet apart, with two ladder jacks and a 2-foot by 12-foot piece of

---

[5] Crye state that could not remember the price details of the workers' pay and schedule, such as whether the workers were paid hourly or daily; however, he indicated that he believed they were paid $100 to $120 per day for an eight-hour work day and that if they worked only four hours, they would charge only for half the day. (Doc 52-6 at 4-5). Inman stated that the workers would tell him, as a group, how many hours had been worked in a given week, and he would write a check directly to one of the workers, who would then pay the remaining workers. (Doc. 39-3 at 9-12, 15).

lumber that served as a "walk board." (Doc. 52-3 at 6-7). A step ladder was also placed on the walk board between the two ladders to allow the workers access to the other ladders from the walk board itself. (Doc. 39-6 at 5-6). Elbert Dunaway testified that the crew would have erected a different type of scaffolding than the ladder jack scaffolding if Inman had requested that they do so. (Doc. 52-9 at 2).

Nelson was unfamiliar with the ladder jack system and thus asked the crew prior to the erection of the scaffolding to verify that the ladders being used were heavy duty ladders that were sufficient for use with the ladder jacks. (Doc. 52-3 at 10-11). The ladder jacks specified that they were "[r]ecommended for use in ladders up to rated at 300 pounds for 375-pound type." (Doc. 44-1 at 11). The crew told Nelson that the ladders were construction grade with a 300-pound rating. (*Id.* at 11).

One of the ladders supporting the scaffolding, however, was a Louisville Type II Medium Duty ladder, which was rated only for a 225-pound total load. (Doc. 44-1 at 35; Doc. 52-5 at 12; Doc. 52-9 at 4). This ladder, which was owned and brought to the job site by Elbert Dunaway, had been previously damaged and substantially altered after being hit by a truck. (Doc. 44-1 at 35; Doc. 52-5 at 12; Doc. 52-9 at 4). Specifically, portions of the top of the ladder were bent with pliers and the top run was then cut off. (Doc. 52-5 at 12; Doc. 52-9 at 5). Nelson did not notice anything odd about the ladders and stated that both "appeared . . . to be in good shape." (Doc. 52-3 at 7, 9). According to Elbert Dunaway, someone who did not know that the ladder's history "wouldn't have known" that the ladder was damaged or altered. (Doc. 52-9 at 12). Elbert Dunaway testified that he did not see any reason not to use a ladder that had been damaged so long as the damaged part was cut off. (Doc. 52-9 at 9). Johnny Inman did not provide or inspect the ladders used to erect the scaffolding and had no knowledge that the crew

was using a ladder that had been damaged and altered.  (Doc. 52-2 at 13-15, 19; Doc. 52-9 at 11).  Johnny Inman stated that if he had known the ladder was damaged he "would have probably recommended that he maybe use another one" but expressed an opinion that he lacked the authority to "tell [the crew] what to do. "  (Doc. 39-3 at 14).

Johnny Inman stated that framing a house can be a dangerous job because the workers are high up in the air and "could fall off" while performing their work.  (Doc. 52-2 at 14).  Inman did not go to the job site to make sure that the scaffolding was safe.  (*Id.* at 13-15).  He did, however, provide the crew with two safety harnesses to use at their discretion; however, the crew did not use the harnesses while on the scaffolding.  (*Id.* at 14-15; Doc. 52-9 at 6).  According to several of the crew members, they would have worn the harnesses or taken additional safety measures on the scaffolding if Inman had expressly told them to.  (Doc. 39-4 at 12; Doc. 52-9 at 6-8).  Nelson indicated that he was aware of fall protection equipment for big commercial jobs and that he had worn a safety harness before, including at the Hughes property on occasions when he was working on the roof.  (Doc. 39-1 at 11-13).

On June 2, 2011, Nelson and DJ Dunaway were on the scaffolding.  (Doc. 52-3 at 4, 6).  Nelson stepped up onto the step ladder on the walk board, and immediately thereafter, the scaffolding fell.  (*Id.*; Doc. 39-6 at 7).  According to the workers on site, a piece of one of the ladders that was supporting the scaffolding "snapped" and broke off from the ladder, causing the scaffolding to collapse.[6]  (Doc. 39-6 at 7-9; Doc. 52-3 at 4, 6).  Elbert Dunaway testified that he had inspected the scaffolding before anyone climbed it that day.  (Doc. 52-9 at 2-3).  After the accident, Eddie Dunaway threw the broken portion of the ladder away.  (*Id.* at 9).

---

[6]  The two extension ladders used in the scaffolding construction were used by Nelson and the crew without incident in the week prior to the accident.  (Doc. 52-3 at 7, 9).

Following the accident, Hughes' wife called Inman and told him that she believed that the scaffolding the crew had been using was unsafe and told him that she did not want the crew using it on the Hughes' property any longer. (Doc. 39-1 at 16). Inman then borrowed a tiered scaffolding system from another subcontractor for the crew to use on Hughes' job site. (Doc. 52-2 at 15).

Plaintiffs initiated this action in Tennessee state court on May 30, 2012 against Defendants Inman Homes and Louisville Ladder. (Doc. 1-1). Defendant Louisville removed the action to this Court on June 25, 2012, pursuant to 28 U.S.C. § 1441, asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332. (Doc. 1). On February 1, 2013, Plaintiffs filed their Amended Complaint against Defendants Inman and Louisville, as well as Danny Dunaway, Elbert "Sewell" Dunaway, and Sam Crye. (Doc. 17). Plaintiffs' Amended Complaint asserts the following claims: (1) negligence by Dunaway, Dunaway, and Crye; (2) negligence, negligent hiring, and negligent supervision by Inman; and (3) strict products liability, breach of express and implied warranty, and negligent manufacture and sale by Louisville. (*Id.* at 4-5). Plaintiff Jason Nelson requests compensatory damages in the amount of $750,000.00 as to all Defendants jointly and severally for his injuries, physical and emotional suffering, loss of income, and loss of enjoyment of life. (*Id.* at 5-6). His wife, Debra, requests $50,000.00 for loss of consortium. (*Id.* at 6).

Defendants Inman and Louisville have now moved for summary judgment as to all claims against them. (Docs. 38, 40). Plaintiffs have responded to Inman's Motion for Summary Judgment (Doc. 52), but they have filed no response or opposition to Louisville's Motion for Summary Judgment.

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  As previously noted, when ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists*.  Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374

(6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56).  The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial.  *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010).  A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374.  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.

## III.  ANALYSIS

### A.  Louisville's Motion for Summary Judgment

Louisville argues that Plaintiffs have failed to produce any evidence that the ladder it manufactured that was involved in Plaintiff's accident was defective or unreasonably dangerous at the time that it left Louisville's control.  (Doc. 41 at 5-6).  Louisville argues that the evidence demonstrates that the "use of two medium-to-light duty extension ladders on the day of the accident violated the minimum load rating on the ladder jacks," and that the ladder was altered or changed.  (*Id.* at 6).  Finally, Louisville argues that, because the evidence shows that the ladder was altered or changed after it left the manufacturer's control, it is entitled to judgment pursuant to Tenn. Code Ann. § 29-28-108.  (*Id*).

As previously noted, Louisville's Motion for Summary Judgment (Doc. 40) has not been opposed by Plaintiff.  A district court cannot grant summary judgment in favor

of a movant simply because the adverse party has not responded; at a minimum, the Court is required to examine the motion to ensure that the movant has met its initial burden. *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998). However, in the absence of a response, the Court will not "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992). "Rather, in the reasoned exercise of its judgment the court may rely on the moving party's unrebutted recitation of the evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are uncontroverted." *Id.* (internal quotation marks omitted). If such evidence supports a conclusion that there is no genuine issue of material fact, the court will determine that the moving party has carried its burden, and "judgment shall be rendered forthwith." *Id.* (alteration omitted).

As required, the Court has reviewed the record, including those "particular parts of materials in the record" to which Defendant Louisville cites in its Motion and accompanying brief. *See* Fed. R. Civ. P. 56(c)(1)(A). The Court finds that the record supports Defendant's recitation of the material facts, and the Court will therefore rely on them as uncontroverted. *See Guarino*, 980 F.2d at 407.

The Tennessee Products Liability Act provides in relevant part that:

"Product liability action" for purposes of this chapter includes all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever[.]

Tenn. Code Ann. § 29-28-102(6).  Under the TPLA, "[a] manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller."  Tenn. Code Ann. § 29–28–105; *see Higgs v. Gen. Motors Corp.*, 655 F. Supp. 22, 23 (E.D. Tenn. 1985).  A manufacturer or seller will also not be liable for any injury where the product was "not unreasonably dangerous at the time it le[ft] the control of the manufacturer or seller but was made unreasonably dangerous by subsequent unforeseeable alteration, change, improper maintenance or abnormal use[.]"  Tenn. Code Ann. § 29-28-108.  "A defect in a product may be proven by direct evidence, circumstantial evidence, or a combination of both. . . .  In layman's terms, the plaintiff must prove that something was wrong with the product."  *Whaley v. Rheem Mfg. Co.*, 900 S.W.2d 296, 299 (Tenn. Ct. App. 1995) (citations and quotation marks omitted).

In this case, Plaintiffs have failed to demonstrate that there is a genuine issue of material fact as to whether the Louisville ladder used in the scaffolding system was unreasonably dangerous or defective at the time it left Louisville's control.  Defendant Louisville has pointed out that Plaintiffs lack any evidence to support the allegations in their pleading that something was wrong with the ladder in question that is attributable to Louisville's manufacture or sale of the ladder.  Plaintiff has failed to come forward with any evidence to refute Louisville's argument that no such evidence exists.  Additionally, Louisville has pointed to evidence in the record demonstrating that the ladder was improperly used with the ladder jacks and that the ladder was substantially damaged and altered after the point of sale.  This evidence reasonably suggests that, to

the extent that the Louisville ladder was the cause of the accident that led to Plaintiff Jason Nelson's injuries, any failure of the ladder was not due to Defendant Louisville's manufacture or sale of the product. Thus, the Court finds that there is no genuine issue of material fact that the ladder was dangerous or defective at the time it left Louisville's control or that Defendant Louisville proximately caused Plaintiff Jason Nelson's injuries. The Court will accordingly **GRANT** Defendant Louisville's Motion for Summary Judgment (Doc. 40), and all claims against Defendant Louisville will be **DISMISSED WITH PREJUDICE**.

### B.    Inman's Motion for Summary Judgment

In its Motion for Summary Judgment, Inman argues that based on the factors established by Tennessee law, the Dunaways and Crye were not employees of Inman, but rather were independent contractors, and that, because it did not have the right to control the conduct of the crew's day-to-day work, it cannot be liable for Plaintiff's harms under agency or respondeat superior principles. (Doc. 39 at 5-8). Inman next argues that, even if the Dunaways and Crye were its employees, it is shielded from liability for any negligent acts because the alleged employees were merely "lent servants, who reported to and were directly supervised by Jason Nelson who, along with Thomas Hughes, controlled the manner and details of the work performed. (*Id.* at 8-9). Inman also argues that Plaintiffs failed to establish a genuine issue of material fact as to negligent hiring or supervision, as there is no evidence that Inman had knowledge that its crew members were unfit for the job. (*Id.* at 9-10). It further argues that Plaintiffs' negligence claim must fail, as Inman owed Jason Nelson no duty to provide a safe work place. (*Id.* at 10-11). Finally, Inman argues that no reasonable jury could find that Jason Nelson was less than fifty percent at fault for the accident as Nelson was familiar

with, but failed to use, fall protection, and did not object to the construction of the scaffolding in question; accordingly Inman argues that it is entitled to summary judgment based on its defense of comparative negligence. (*Id.* at 12-13).

### 1. *Negligent Hiring & Supervision*

Plaintiffs' Amended Complaint raises claims against Defendant Inman for negligent hiring and negligent supervision. (Doc. 17). In its Motion for Summary Judgment, Defendant Inman argues that Plaintiffs cannot establish the necessary elements to support claims of negligent hiring or supervision. (Doc. 39 at 9-10). In their response, Plaintiffs did not present any arguments or evidence that addressed Defendant Inman's arguments regarding his claims for negligent hiring and negligent supervision. (*See* Doc. 52).

The Court agrees with other courts that have held that a party may abandon claims by failing to address or support them in a response to a motion for summary judgment. *See, e.g.*, *Clark v. City of Dublin, Oh.*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (finding that, when a plaintiff did not properly respond to arguments asserted by a defendant's motion for summary judgment as to two claims, "the District Court did not err when it found that the Appellant abandoned [those] claims"); *Conner v. Hardee's Food Sys., Inc.*, 65 F. App'x 19 (6th Cir. 2003) (finding that the plaintiffs had abandoned their claim "[b]ecause [they] failed to brief the issue before the district court"); *Anglers of the Au Sable v. United States Forest Svc.*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment."); *see also Morris v. City of Memphis*, 2012 WL 3727149, at *2 (W.D. Tenn. Aug. 27, 2012) (collecting cases). The Court will thus deem

Plaintiffs' claims for negligent hiring and negligent supervisions abandoned, and Defendant Inman's Motion for Summary Judgment (Doc. 38) will be **GRANTED IN PART** with respect to those claims, which will be **DISMISSED WITH PREJUDICE**.

### 2. Negligence

Plaintiffs have also alleged that Inman, by and through its employees, agents, or subcontractors, and under agency principles or the theory of respondeat superior, is liable for negligence. (Doc. 17 at 4). Specifically, Plaintiffs argue that the construction of the scaffolding and the supervision of the construction were negligent, as Defendants failed to provide fall protection and used damaged, unsafe, and/or inappropriate materials to construct the scaffolding. (*Id.*). Under Tennessee law, the plaintiff must establish each of the following elements in order to succeed on a claim of negligence: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation. *Staples v. CBL Assoc., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). Defendant Inman has raised several distinct arguments in its summary judgment motion that speak to the first two prongs of the negligence analysis – that is, Inman has argued that it owed no duty to Plaintiff Nelson and that the conduct that caused Plaintiff's injuries is not attributable to Inman or any of its agents. Inman has also argued that it is entitled to summary judgment based on its affirmative defense of comparative negligence. The Court will address Defendant Inman's arguments in turn.

### a. Relationship between Inman and the crew

Inman first argues that it cannot be liable for any negligent acts of its workers because no agency relationship existed between Inman and the crew – that is, the crew

members were independent contractors rather than employees. Under Tennessee law, a principal may be bound by the negligent acts of its agents and employees performed on the principal's behalf and within the actual or apparent scope of the agency pursuant to the doctrine of respondeat superior. *Hibbs v. Hernandez*, 2006 WL 389857, at *4 (E.D. Tenn. Feb. 17, 2006) (quoting *Russell v. City of Memphis*, 106 S.W.3d 655, 657 (Tenn. Ct. App. 2002)); *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2000); *Smith v. Henson*, 381 S.W.2d 892, 897 (Tenn. 1964). However, a principal is generally not liable for the tortious acts of an independent contractor. *See, e.g., Givens v. Mullikin ex rel. McElwaney*, 75 S.W.3d 383, 394 (Tenn. 2002); *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 52 (Tenn. Ct. App. 2004).

"Whether an agency relationship exists at all must be determined by the facts and circumstances of the case. The intentions of the parties are not controlling." *Humphrey v. TomKats, Inc.*, 2006 WL 2285806, at *9 (Tenn. Ct. App. Aug. 8, 2006) (citing *Rich Printing Co. v. McKellar's Estate*, 330 S.W.2d 361, 376 (1959)). Factors that courts are to consider when determining whether a worker is an employee or independent contractor are 1) the right to control the conduct of the work, 2) the right of termination, 3) the method of payment, 4) the freedom to select and hire workers, 5) the furnishing of tools and equipment, 6) self-scheduling of work hours, and 7) being free to render services to other entities. Tenn. Code Ann. § 50-6-102; *Bargery v. Obion Grain Co.*, 785 S.W.2d 118, 119-20 (Tenn. 1990); *Wright v. Knox Vinyl & Aluminum Co., Inc.*, 779 S.W.2d 371, 373 (Tenn. 1989); *Maisers v. Arrow Transfer & Storage Co.*, 639 S.W.2d 654, 656 (Tenn. 1982). The fact that liability insurance was carried on behalf of the workers is not alone sufficient to establish an employee-employer relationship, but it may be considered along with other evidence that would tend to demonstrate a master-

servant relationship.  *See Grace v. Louisville & N.R. Co.*, 89 S.W. 2d 354, 359 (Tenn. Ct. App. 1935)  "[A]lthough no indicia is infallible or entirely indicative, it has generally been recognized . . . that the primary test for determining . . . status as employee or independent contractor is the right to control."  *Maisers*, 639 S.W.2d at 656 (internal citations omitted); *see also Bargery*, 785 S.W.2d at 120 ("[W]hile all factors are important, the 'right to control' is the primary test").  Further, "[t]he test is not whether the right to control was exercised but merely whether the right to control existed." *Carver v. Sparta Elec. Sys.*, 690 S.W.2d 218, 220 (Tenn. 1985).

Several factors weigh in favor of finding that the workers were employees, as the evidence demonstrates that Inman had the right to terminate the workers and retained the freedom to select, hire, and replace the workers in the event of the worker's absence. The method of payment also weighs in favor of finding that the workers were employees, as they were paid at regular intervals – that is, weekly – for hours actually worked, rather than in a flat fee or percentage of work completed manner.  *See Hibbs*, 2006 WL 389857, at *5.  Additionally, Inman was required to and actually did carry liability insurance on behalf of the workers, and the workers carried no such insurance on their own behalves.  On the other hand, two factors weigh in favor of finding that the workers were independent contractors, as the workers maintained freedom to schedule their own work hours and to render services to other entities

Nonetheless, genuine issues of material fact exist as to two factors: the right to control the conduct of the work and the furnishing of tools and equipment.  While it is undisputed that the workers provided their own tools, there is a dispute as to whether Inman was responsible for supplying the equipment used at the job site, or rather, whether the workers themselves bore that responsibility.  Indeed, the facts suggest that

a hybrid approach was employed, as some equipment was provided by the workers, some equipment was provided by Inman, and additional equipment could have beeen obtained by the workers at Inman's expense.

The most disputed and most crucial factor, however, is the right to control the conduct of the work performed by the crew. Hughes and Nelson have testified that they believed that Johnny Inman, rather than Nelson, would be supervising the work of the crew, whereas Johnny Inman testified that he did not believe that he had a duty or responsibility to supervise the workers that he provided to Hughes. Although the workers themselves testified that they believed they were acting as independent contractors, they also testified that Inman was their boss. Johnny Inman was not at the job site on a daily basis, but came to the site one to three times per week to ensure that his crew was getting work done. Johnny Inman gave the workers general instructions regarding the scope of their work; daily detailed instructions were given to the crew either by Nelson or the supervisory crew member – first Crye, then Danny Dunaway. However, the crew and Nelson generally discussed the day's work as a group with no one person in charge or "domineering." Hughes provided specific details as to how he wanted a few aspects of the work performed, such as requiring that the crew not use nail guns and wait to install the siding after the walls were finished. The workers testified that they would have followed any instructions that Johnny Inman gave them regarding the manner in which to execute the work at Hughes' job site, and specifically, that they would have used a different type of scaffolding, worn harnesses on the scaffolding, or taken additional safety measures if Inman had requested that they do so.[7]

---

[7] Indeed, after the accident and after a request from Mr. Hughes' wife, Inman borrowed another type of scaffolding system for the crew to use on the Hughes' job site, as opposed to the ladder jack scaffolding system.

These facts demonstrate that a genuine dispute exists as to who had the right to control the crew of workers: Inman, Nelson, Hughes, the workers themselves, or some combination of the above. A determination of these disputed factual issues would require the Court to weigh the evidence or determine the credibility of witnesses, which it is not permitted to do at the summary judgment stage. The Court, construing the evidence in the light most favorable to Plaintiffs, finds that a reasonable jury could find that the workers were Inman's employees, rather than independent contractors, that he had the right to control the details of their work, and that Inman should thus be liable for any negligent acts of its employees committed within the scope of that employment.[8]

b. Duty of Care

Inman next argues that it did not owe Plaintiff Jason Nelson a duty of care because no special relationship existed between Inman and its "independent contractors" or between Inman and Nelson. In Tennessee, "duty of care" is "the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). Tennessee common law recognizes that "an individual has a duty to exercise reasonable care in his or her activities in order to prevent unreasonable risks of harm from arising." *Downs ex rel Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008); *Bradshaw v. Daniel*, 854 S.W.2d 865, 870 (Tenn. 1993) ("[A]ll

---

[8] Defendant Inman has additionally and alternatively argued that, even if the crew members are deemed "employees" rather than independent contractors, it is nonetheless entitled to summary judgment because the employees were "borrowed servants" or "loaned employees" under Tennessee law. (Doc. 39 at 8-9). However, the loaned employee doctrine also requires a finding that the "special" or borrowing employer had the right to control the details of the work, rather than the regular or contracting employer. *Anderson v. Fru-Con Constr. Corp.*, 125 F. App'x 5, 9 (6th Cir. 2004) (quoting *Winchester v. Seay*, 409 S.W.2d 378, 381 (Tenn. 1966)). Because the Court finds that genuine issues of material fact exist as to who had the right to control the work performed by the crew of laborers, the Court cannot grant Defendant Inman's request for summary judgment based on the loaned employee doctrine.

persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others."). "A risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *Downs*, 263 S.W.3d at 820 (quoting *McCall*, 913 S.W.2d at 153).

Defendant Inman attempts to frame the duty issue in this case as whether it had a "duty to warn" Plaintiff of the dangers posed by its crew members based on a "special relationship" with either the workers or Nelson himself. (Doc. 10-11) (quoting *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). However, as discussed above, if the finder of fact determines that the workers were Inman's employees and agents, the liability for the workers' acts of negligence would attach to Inman through the doctrine of respondeat superior and agency principles. In that scenario, no special relationship is necessary to determine that Defendant Inman owed Nelson a duty of care, as the workers' general duty to refrain from conduct that would reasonably cause others injury would attach to Inman.[9] Because genuine issues of material fact exist that preclude the Court from determining whether or not the workers were Inman's employees or whether they were independent contractors, the Court cannot make a legal determination at this stage regarding the extent of the duty that Inman may or may not have owed to Plaintiff Jason Nelson under Tennessee common law.

The remainder of the parties' arguments regarding the duty of care determination center around the applicability of the doctrine of negligence *per se*. (Doc. 39 at 11; Doc. 52 at 14-17; Doc. 54 at 7-13). "The negligence *per se* doctrine does not create a new cause of action. Rather it is a form of ordinary negligence that enables the courts to use

---

[9] Defendant Inman has not argued that the workers did not have a general duty to not engage in foreseeably dangerous conduct or that their actions were not foreseeably dangerous.

a penal statute to define a reasonably prudent person's standard of care." *Rains v. Bend of the River*, 124 S.W.3d 580, 589 (Tenn. Ct. App. 2003) (internal citations omitted). Nonetheless, in Tennessee, a plaintiff still has an obligation to specifically plead or assert a claim for negligence *per se*. *See Messer v. Griesheim Indus., Inc. v. Eastman Chem. Co.*, 194 S.W.3d 466, 482-83 (Tenn. Ct. App. 2005) (noting that "not every statutory violation gives rise to a negligence *per se* claim. . . . [and] simply referencing the violation of a statute does not necessarily mean that a negligence *per se* claim is being asserted," and finding that the trial court did not abuse its discretion in denying plaintiff an opportunity to amend its complaint to add a claim of negligence *per se* after years of litigation and the conclusion of the vast majority of discovery).

In this case, Plaintiffs did not plead negligence *per se* in either their initial or Amended Complaints. (Docs. 1-1, 17). Indeed, Plaintiffs did not even reference a violation of the statutes that they now argue define the standard of care that Inman owed to Plaintiff Nelson at Hughes' job site. Plaintiffs failed to file a motion to amend their Complaint to add such a claim before the deadline for requesting leave to amend, or at any time thereafter. The Court thus finds that Plaintiffs have failed to assert a claim for negligence *per se* and that this action – which has been ongoing for almost two years and is scheduled for trial in a matter of weeks – has advanced well beyond the stage at which the pleadings could or should be amended. The Court will accordingly disregard the parties' arguments regarding the negligence *per se* doctrine.

c.    Comparative Negligence

Finally, Inman has argued that it is entitled to summary judgment based on its affirmative defense of comparative negligence. Tennessee has "adopted a system of modified comparative fault by which a plaintiff who is less than fifty percent (50%) at

fault may recover damages in an amount reduced by the percentage of fault assigned to the plaintiff." *Ali v. Fisher*, 145 S.W.3d 557, 561 (Tenn. 2004) (citing *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992)). Although a disputed question of comparative fault is generally submitted to a jury, such a question can also be properly raised in a motion for summary judgment. *Henley v. Amacher,* 2002 WL 100402, *6 (Tenn. Ct. App. Jan. 28, 2002). "[I]n a vast majority of cases, the comparison and allocation of fault is a question of fact to be decided by the finder-of-fact, that is the jury or the trial court sitting without a jury." *Id.* (citing *Brown v. Wal-Mart Discount Cities*, 12 S.W.3d 785, 789 (Tenn. 2000); *Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997); *Prince v. St. Thomas Hosp.,* 945 S.W.2d 731, 735 (Tenn. Ct. App. 1996)). "The task of comparing and allocating fault may be taken from the jury only when it can be determined beyond question (or alternatively, when reasonable minds cannot differ) that the plaintiff's fault is equal to or greater than the defendant's." *Id.* (citations omitted); *Staples*, 15 S.W.3d at 91 ("If the evidence is evaluated in the light most favorable to the plaintiff and reasonable minds could not differ that her fault was equal to or great[er] than that of the defendant's, summary judgment in the defendant's favor may be granted.").

Defendant Inman has asserted that it is entitled to a summary judgment on Plaintiffs' claims based upon the Tennessee law of comparative fault because, as a matter of law, Plaintiff was at least 50 percent responsible for the accident and, therefore, cannot recover. Specifically, Defendant contends that: (1) Nelson watched the construction of the scaffolding and did not object to or try to change it; (2) "no one was in a better position to discover and correct" the safety issues with the scaffolding, such as the improper construction and the use of damaged equipment, than Nelson himself;

and (3) Nelson failed to use fall protection equipment on the date of the accident, despite the fact that such equipment was available on site and that he had used such equipment in the past.  (Doc. 39 at 12-13).

Plaintiffs dispute Inman's suggestion that no reasonable trier of fact could find that Plaintiff Nelson was less than fifty percent at fault for the accident.  Plaintiffs argue that Nelson was not a supervisor, but rather, was merely a carpenter working on the project along with Inman's crew, and was thus not responsible for supervising the work of that crew.  Plaintiffs argue that Inman was negligent in failing to supervise the work done by its crew – including the erection of the scaffolding – and that Elbert Dunaway was negligent in providing and using a ladder that had been damaged and/or altered to construct the scaffolding.  (Doc. 52 at 17-19).

As discussed above, the evidence in this case is disputed as to whether Plaintiff Jason Nelson had any supervisory role or control over the work performed by Inman's crew of workers, or whether Inman itself was responsible for overseeing the details of the work performed by its crew.  This dispute is relevant to the issue of comparative fault, as it directly bears upon whether Nelson, Inman, or the crew itself was responsible for ensuring that the scaffolding was safely constructed with appropriate equipment and materials.  Additionally, the undisputed facts demonstrate that, although Elbert Dunaway was aware that the Louisville ladder used to construct the scaffolding had been damaged and altered, neither Johnny Inman nor Jason Nelson had knowledge of or reason to believe that the ladder had been damaged and altered.  This too is relevant to the determination of comparative fault, as a jury could find that Elbert Dunaway was in the best position to prevent the accident by notifying the rest of the crew and/or his supervisors that the ladder was damaged or by simply not providing the damaged ladder

for use on the job site. In light of these facts, and construing all evidence in light most favorable to the Plaintiff, the Court finds that it cannot allocate percentages of fault to the various parties to this action without weighing the evidence and resolving disputed issues of fact.

The Court finds that genuine issues of material fact preclude it from determining at this stage that Inman cannot be liable to Plaintiffs for the alleged negligence of the crew of workers or that Inman did not owe Plaintiff Jason Nelson a duty of care under Tennessee common law, and further finds that Plaintiff has presented sufficient evidence to support the conclusion that the issue of comparative fault should be resolved by a jury. Accordingly, Defendant Inman's Motion for Summary Judgment (Doc. 38) will be **DENIED IN PART** with respect to Plaintiffs' claims against Defendant Inman for negligence.

## IV. CONCLUSION

Accordingly, and for the reasons stated herein,

- Defendant Inman's Motion for Summary Judgment (Doc. 38) is hereby **GRANTED IN PART** as to Plaintiffs' claims for negligent supervision and negligent hiring, and **DENIED IN PART** as to Plaintiffs' claim for negligence;

- Defendant Louisville's Motion for Summary Judgment (Doc. 40) is **GRANTED**;

- Plaintiffs' claims for negligent supervision and negligent hiring against Defendant Inman and all claims against Defendant Louisville are hereby **DISMISSED WITH PREJUDICE**;

- The Court will **RESERVE RULING** on the parties' motions in limine (Docs. 60-67) at least until the final pretrial conference of this matter;

- This action will **PROCEED TO TRIAL** as to Plaintiff's claims of negligence against Defendants Inman, Crye, Elbert "Sewell" Dunaway, and Danny Dunaway.

**SO ORDERED** this 27th day of March, 2014.


_____/s/ Harry S. Mattice, Jr._____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE